Jacqueline **BRANDWYNNE**, and
**Brandwynne Corporation,**
Plaintiffs,

v.

**COMBE INTERNATIONAL, LTD. Combe Incorporated, Thomas Smith and Chapin Nolen, Defendants.**

No. 98 Civ. 2653(SAS).

United States District Court,
S.D. New York.

Oct. 19, 1999.

Sam P. Israel, P.C., New York, New York, for Plaintiffs.

Ronald A. Clayton, John D. Carlin, Fitzpatrick, Cella, Harper & Scinto, New York, New York, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

## TABLE OF CONTENTS

I. Introduction .................................................................366
II. Background......................................................................367
    A. Brandwynne's Product Concept..........................................367
    B. Brandwynne's Negotiations With Defendants........................................368
    C. Brandwynne's Commercialization of "Very Private- Intimate Moisture" ..................369
    D. Combe's Commercialization of "VAGISIL® Intimate Moisturizer" ......................370
    E. The Market for Vaginal Moisturizers/Lubricants Prior to September 1993................371
        1. ASTROGLIDE® .................................................372
        2. COMFORT®.....................................................373
        3. SUMMER'S EVE® ..............................................373
III. Legal Standard for Summary Judgment ..............................................373
IV. Discussion ......................................................................374
    A. Plaintiffs' Misappropriation, Breach of Contract and Fraud Claims .....................374
        1. The Threshold Requirement of "Novelty" ...................................374
        2. Plaintiffs' Claims Arising From Misappropriation Theory..........................375
            a. Lack of "Novelty" Prior to Brandwynne's Disclosure to Defendants ..............375
            b. Defendants' Own Research and Development.................................377
            c. Marketing of Very Private- Defeats "Novelty" ...............................378
            d. Conclusion Regarding Plaintiffs' Misappropriation Claims.........................378
        3. Plaintiffs' Claims Arising From Various Contract Theories .........................378
            a. Lack of Property Rights Defeats Plaintiffs' Contract Claims.....................378
            b. Claim Arising Under the Secrecy Agreement.................................378
            c. Claims Asserting Breach of Implied Contracts...............................379
        4. Plaintiffs' Claims Arising From Defendants' Alleged Fraud .........................379
    B. Plaintiffs' Claims for Common Law Trademark and Trade Dress Infringement ...........380
        1. Common Law Trademark Infringement.......................................380
            a. Is Plaintiffs' Mark Entitled to Protection? ..................................380
               i. The Term "Intimate" Is Generic and Not Entitled to Protection..............381
               ii. Plaintiffs Cannot Establish Secondary Meaning ............................382
        2. Trade Dress Infringement.................................................383
    C. Plaintiffs' Claims for False Advertising Under the Lanham Act and New York General Business Law .................................................................383
V. Conclusion .......................................................................384

## I. Introduction

Jacqueline Brandwynne ("Brandwynne") and Brandwynne Corporation, ("Bran.Corp.")(collectively "Brandwynne" or "plaintiffs") sued Combe Incorporated ("Combe Inc."), Combe International, Ltd. ("Combe Int'l"), a wholly-owned subsidiary of Combe Inc., Chapin Nolen, the former President of Combe Inc., and Thomas Smith, the former Vice President of Combe Int'l (collectively "Combe" or "defendants") in April 1998, alleging various claims of misappropriation of trade secrets, unfair competition, fraud, breach of contract, unjust enrichment, breach of fiduciary duty, common law trademark infringement and violations of the Lanham Act, 15 U.S.C. §§ 1125(a). Jurisdiction is based on the Lanham Act, 15 U.S.C. § 1051 *et seq.*, 28 U.S.C. §§ 1331 (federal question), 1332 (diversity of citizenship), 1338 (jurisdiction to adjudicate cases involving trademark infringement and ac-companying claims of unfair competition) and 1367(a) (supplemental jurisdiction).

This case arises out of Brandwynne's dashed hopes for a joint venture with defendants to produce and market her concept for a non-medicinal vaginal moisturizer. Brandwynne, a newcomer to the feminine hygiene industry, lacked the capital to effectively introduce her product into the national marketplace. Combe, by contrast, the health and beauty aid giant, possessed the financial capability and pre-existing national distribution network to establish a prominent name brand vaginal moisturizer.

Brandwynne alleges that after confidentially revealing her concept for a "unique" niche product, defendants rejected her joint venture proposal and, despite the parties' secrecy agreement, misappropriated and successfully marketed plaintiffs'

concept. Defendants now move for summary judgment on all of plaintiffs' claims.[1] Defendants argue that plaintiffs' claims for misappropriation of certain ideas or breach of the secrecy agreement are fatally flawed because plaintiffs' concept was neither novel nor original and, therefore, already in the public domain. Second, defendants contend that plaintiffs do not possess protectable trademark or trade dress rights in the product, thereby defeating any trademark and trade dress claims. Finally, defendants note that plaintiffs' false advertising claims are unsupported by any evidence. For the reasons that follow, defendants motion for summary judgment is granted in its entirety.

## II. Background

Plaintiffs manufacture and market a vaginal moisturizer called "Very Private Intimate Moisture".[2] *See* Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Facts ("Pls.' 56.1") ¶ 1.[3] Combe Inc. manufactures and markets a competing line of feminine hygiene products sold under the registered VAGISIL® trademark. *See* Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") ¶ 4.

---

1. The Amended Complaint alleges the following claims: (1) misappropriation of ideas and breach of implied contract against Combe Int'l; (2) breach of contract and third party beneficiary claim against Combe Inc.; (3) breach of contract against Combe Int'l; (4) misappropriation of trade secrets against all defendants; (5) unfair competition against Combe Inc.; (6) fraud against all defendants; (7) breach of fiduciary duties and aiding and abetting breach of fiduciary duties against all defendants; (8) violations of the Lanham Act § 43(a) against Combe Inc.; (9) common law trademark and trade dress infringement against Combe Inc.; (10) fraud against all defendants; (11) violations of New York General Business Law §§ 349(a) and 350 against all defendants; and (12) quantum meruit and unjust enrichment against Combe Int'l and Combe Inc. Plaintiffs seek damages in excess of $40 million and various forms of injunctive relief.

## A. Brandwynne's Product Concept

Prior to September 1993, Brandwynne recognized that as many as 80 million American women between the ages of 37 and 79 experience vaginal dryness for a variety of physiological and psychological reasons, such as menopause, chemotherapy, lactation, stress, or poor self-image. *See* Pls.' 56.1 ¶¶ 8 & 9; Amended Complaint ("Amended Compl.") ¶¶ 12 & 13. To tap this enormous potential market, Brandwynne conceived a line of vaginal moisturizer products to relive dryness and enhance sexual pleasure. Brandwynne alleges that prior to her development of this concept, other vaginal lubricants were marketed exclusively as sexual lubricants or for medical purposes. *See* Amended Compl. at ¶ 14. Although vaginal suppositories were available, Brandwynne considered them awkward and unnatural. *Id.* ¶ 16. According to plaintiffs, the product concept for an "intimate moisturizer, so natural, it functions and feels like [a] woman's own moisture" was unique at that time. *See* Pls.' 56.1 ¶¶ 10 & 11.

Brandwynne shared her idea with defendants in the form of a Report and presentation.[4] *See* Report, March 1993, attached to Defs.' 56.1, Ex. 3. The Report, which was designed for presentation to "a limited number of parties who may be

---

2. Brandwynne formed her company in 1992, then called Cotsen Capital Inc. ("Cotsen"). In 1995, Cotsen became Bran. Corp. of which Brandwynne is the sole proprietor. *See* Pls.' 56.1 ¶¶ 2 & 3.

3. In addition to their Memorandum of Law, plaintiffs submitted a document entitled "Plaintiffs' Opposition to the Motion for Summary Judgment" containing numbered paragraphs which generally mirror ·Defendants' Local Civil Rule 56.1 Statement. The Court construes this document as Plaintiffs' Rule 56.1 Statement.

4. A question of fact exists as to which materials were actually disclosed to Combe. Combe maintains that it did not receive this Report. However, for the purposes of this motion, Combe will assume that Brandwynne in fact sent the Report to Combe in September 1993.

interested in pursuing a transaction with [Brandwynne]," *id.* at 3, contained descriptions of three target market segments, the essential features and benefits of the product, proposed advertising, a proposed commercial price structure and proposed channels of distribution. *See* Report. The Report, over forty pages in length, detailed the key benefits of Brandwynne's product:

o Clear, clean and natural, feels and functions like a woman's own moisture.

o Provides lubrication, desirable "slip" for intimacy.

o Safe, *long lasting lubrication and* comfort.

o All ingredients in formulation safe, (inactive, cosmetic classification) in market use for many years.

o Gynecologist tested and approved.

o Thinner than existing lubricants, better slip, better moisturization.

o Non-sticky, non-greasy, odorless, tasteless, stainless.

o Leaves no residue, discreet, not visible.

o Hypo-allergenic, unscented.

o Compatible with condoms.

Report at 16. Brandwynne believed that the above features, as well as the packaging and marketing of her product combined to create a unique idea. *See* Pls.' 56.1 ¶ 11. Specifically, Brandwynne's Report touted the following features relevant to "product uniqueness":

o Very Private⁻ is positioned as a quality bodycare product, not a medical or quasi-medical gel like KY or Ortho Lubricant.

o Very Private⁻ is the first intimate moisturizer that feels and functions like a woman's own moisture. It was formulated specifically *to moisturize*

*instantly and enhance sexual intimacy.*

o Very Private⁻ is totally clear. No fragrance, no taste, no visible residue or "crusting" like current vaginal products.

o Very Private⁻ can be used during the day, every day, to ease dryness and the symptoms of dryness in the intimate area, to make a woman feel more comfortable all day long.

o Very Private⁻ can also be used before intimacy, to relive dryness instantly and enhance intimacy.

o Very Private⁻ has the look and presentation of an elegant, cosmetic product and is gynecologist tested and approved, unlike current quasi-medical lubricants that are presented in a functional, low-cost way.

Report at 15 (emphasis in original). In the Spring of 1993, Brandwynne filed an application for the registration of the phrase "So Natural, Like a Woman's Own Moisture" with the United States Patent and Trademark Office ("PTO").[5] Amended Compl. at ¶ 22.

## B. Brandwynne's Negotiations With Defendants

In September 1993, Brandwynne and Smith agreed to discuss Brandwynne's Very Private⁻ brand. Approximately three weeks prior to their first meeting, Brandwynne sent Combe, Inc. a copy of her Report, the first sentence of which states "the information contained herein shall be kept confidential." Pls.' 56.1 ¶ 18; Report at 3. Also prior to the first meeting, Brandwynne sent Smith a proposed "Confidentiality Agreement". Pls.' 56.1 ¶ 16. Defendants declined to sign the "Confidentiality Agreement" and instead sent Brandwynne their standard "Secrecy Agreement" which she executed. Pls.'

---

**5.** Slogans may be registered when they are used to identify the goods or services of the applicant and distinguish them from the goods or services of others. *See, e.g., In re*

*European–American Bank & Trust Co.,* 201 U.S.P.Q. 788, 789, 1979 WL 24821 (T.T.A.B. 1979).

56.1 ¶ 20. That Secrecy Agreement provides in pertinent part:

> COMBE agrees to retain in confidence and not to disclose to third parties any CONFIDENTIAL INFORMATION received from [Brandwynne] in accordance with the terms of this agreement. . . . The foregoing obligation of confidentiality shall not apply to any portion of the disclosed CONFIDENTIAL INFORMATION which:
>
> (a) at the time of disclosure is in the public domain;
>
> (b) after disclosure is disclosed to third parties without obligations of confidentiality, or is published, or otherwise becomes part of the public domain, through no fault or action of COMBE;
>
> .  .  .  .  .
>
> 6. The parties understand and agree that nothing herein shall obligate [Brandwynne] to sell, nor COMBE to purchase, the subject PRODUCT. Nor shall the parties be obligated in any way to enter into any further agreements. The parties recognize and agree that the disclosure being made hereunder is for purposes of COMBE'S evaluation only.
>
> .  .  .  .  .
>
> 8. This agreement contains the entire understanding of the parties and supersedes all prior agreements and understandings relative to the transactions contemplated herein, whether written, oral, expressed or implied, and the provisions of this agreement may not be altered, modified, amended or waived except by a writing which is executed by both parties.

Secrecy Agreement, September 10, 1993, attached to Defs.' 56.1, Ex. 31. After executing the Secrecy Agreement, Brandwynne made her presentation to Nolan on September 29, 1993. Pls.' 56.1 ¶ 20. In the ensuing several months, Combe did not contact Brandwynne to express an interest in pursuing a joint venture. In the meantime, Brandwynne launched her product without Combe's assistance.

## C. Brandwynne's Commercialization of "Very Private· Intimate Moisture"

In April 1994, seven months after meeting with Combe, Brandwynne began marketing and selling "Very Private· Intimate Moisture" in interstate commerce. The product is contained in a white plastic bottle, designed to stand on its top with the dispenser at the bottom, with a beige and white label with green lettering. The brand name "Very Private"· appears in enlarged white capital letters within a green rectangle; the remainder of the text, separated from the name, includes the words "intimate moisture" in green lettering on a white and beige background. The bottle is packaged in a box measuring 4–5/8" high by 1–7/8" wide by 1–3/8" deep and featuring the identical lettering and color motif of the bottle. *See* Defs.' 56.1, Exs. 74 & 75. The front of the box features, in part, the following text:

> *Relieves intimate dryness Instantly, enhances intimacy*
>
> **Gynecologist tested and approved**

Defs.'s 56.1, Ex. 75 (emphasis in original). The back of the box states, in part:

> Very Private· *Intimate Moisture feels and functions like a woman's own moisture·  to relieve vaginal dryness instantly and enhance intimacy.*  . . . Very Private· is a thin, clear liquid providing excellent slip. Unlike sticky, greasy gels and lubricants, it leaves no residue. Odorless, flavorless and *hypo-allergenic,* it is *gynecologist tested and approved.*
>
> Directions:  . . . apply a few drops of Very Private· daily. . . . Repeat before intimacy for instant lubrication. Very Private· is *not* a contraceptive. Does not harm condoms.

*Id.* (emphasis in original). In 1997, the text on the box was revised slightly. *See* Defs.'s 56.1, Ex. 76. On the Very Private· web site, <*www.veryprivate.com*>, plaintiffs use the terms "intimate moisture" and

"intimate moisturizer" interchangeably. *See* Defs.' 56.1, Exs. 77–78 A–I ("A few drops of intimate *moisturizer* before and after intimacy will do the trick"; "The first intimate *moisture* to eliminate vaginal dryness instantly . . ."; "The first intimate *moisturizer* that feels as natural as a woman's own lubricating fluid"; "It is advisable to always use an intimate *moisturizer* before intercourse to protect the tender tissue").

On September 10, 1997, Brandwynne filed an application with the PTO to register the term "VERY PRIVATE INTIMATE MOISTURE" as a trademark for "non-medicated personal hygiene preparations for vaginal care; namely, washes, lubricants, moisturizers, conditioners, lotions, cleansers, personal care preparations, moisturizing lotions, body lotions and skin lotions." Pls.' Application to PTO, Defs.' 56.1, Ex. 74. In that application, Brandwynne disclaimed the exclusive right to use the word "moisture" apart from the mark. *Id.*

Plaintiffs have only sold Very Private Intimate Moisture in Colorado, California and Texas. Sales in 1998 were $100,000. *See* Pls.' 56.1 ¶ 59. Brandwynne did not advertise until 1996. Subsequent advertising expenses were $11,336 in 1996, $52,875 in 1997 and $52,875 in 1998. *See* Pls.' Response to Defs.'s Third Set of Interrogatories, Defs.' 56.1, Ex. 79.

### D. Combe's Commercialization of "VAGISIL® Intimate Moisturizer"

As early as 1973, Combe Inc. began manufacturing and marketing a line of feminine hygiene products in the United States under the registered trademark VAGISIL®, including VAGISIL® medicated lotions, VAGISIL® medicated cremes, VAGISIL® cosmetic powder, VAGISIL® cosmetic deodorant sprays and washes, VAGISIL® vaginal suppositories and VAGISIL® lotions for feminine use. *See* Defs.' 56.1, Exs. 80–85. In May 1993, five months before Brandwynne approached Combe with her concept, Cynthia D'Andrea–Herns, Combe's feminine hygiene product expert, distributed to high level management at Combe Inc. and Combe Int'l a memorandum which included a comprehensive overview of the market for products that alleviate vaginal dryness. *See.* Memorandum, May 7, 1993, Pls.' 56.1, Ex. 6. D'Andrea–Herns' scientific and market research indicated potential for future growth. While Johnson & Johnson marketed K–Y Jelly first as an aid to medical professionals and later as a sexual lubricant, two other manufacturers were producing and marketing "breakthrough" moisturizers much like Very Private. *Id.* at 1127–28. D'Andrea–Herns noted that Warner–Lambert's REPLENS® and Schering–Plough's GYNE–MOISTRIN® featured characteristics aimed at a new female market. *Id.* at 1129.

In July 1995, twenty-two months after Brandwynne's presentation, Combe Inc. began to test market a vaginal moisturizer called VAGISIL® intimate moisturizer. *See* Defs.' 56.1 ¶ 61. The product, a clear, non-medicated liquid designed for digital application, was launched for national retail sales in April 1996. *See id.* at ¶¶ 61 & 62. The product is contained in a pearl-colored plastic bottle, designed to stand upright with the dispenser at the top. The bottle contains blue and purple lettering and a large stylized "V" in a blue box. The back of the bottle contains the following text:

> It's like your own natural moisture is back—instantly. Unlike ordinary jelly, gels, creams and lubricants, this light, clear lotion is a unique blend of moisturizers specially created to feel smooth as liquid silk. Never greasy or messy. Water soluble, so it can't harm tampons or condoms. Gentle too, to use as often as you like to relieve or prevent vaginal dryness.

Defs.' 56.1, Ex. 87. Originally, the product was packaged in a box measuring 4–3/8" high by 3–1/8" wide by 1" deep and labeled "Vagisil Intimate Moisturizer". *See id.*

Subsequently, Combe dropped the "TM" symbol appearing after the word "Moisturizer" on its bottles and boxes. Defs.' 56.1 ¶ 65 & Ex. 88.

### E. The Market for Vaginal Moisturizers/Lubricants Prior to September 1993

Plaintiffs argue that when Brandwynne brought her Very Private concept to the attention of Combe, there were no other products on the market similar to Very Private Intimate Moisture in its totality. Nevertheless, plaintiffs acknowledge that prior to that time, other vaginal moisturizers and lubricants were available to consumers. *See* Pls.' 56.1 ¶ 22. Indeed, Brandwynne's own March 1993 Report contains a chart distinguishing Very Private from six available competing products. *See* Report at 25 & 26. Plaintiffs' chart is reproduced below in its entirety.

### COMPETITIVE PRODUCTS

| NAME | POSITIONING | CHARACTERISTICS | MOISTURIZING/ LUBRICATION |
| --- | --- | --- | --- |
| KY Jelly, Johnson & Johnson | General lubricant. | Old-fashioned tube and packaging (30 years old); used by gynecologists and hospitals; sticky; dries quickly; feels and looks tacky. | OK for lubricating; medicinal; not elegant; not formulated to moisturize. |
| Ortho Personal Lubricant, Johnson & Johnson | Lubrication for sexual intercourse or vaginal dryness. | Water solubl'e gel; messy; old fashioned tube and packaging; looks and smells unappealing; sticky. | OK for lubricating; not formulated to moisturize. |
| Replens, Colombia Laboratories | Vaginal moisturizer. | Applied with syringe-like applicator; recommended by gynecologists; cumbersome and sometimes "clots"; white and greasy; very medicinal; requires continued therapy; not spontaneous. | Moisturization good after extended use; polymer adheres to vaginal wall. |
| Today Personal Lubricant, American Home Products | General lubricant and sexual lubricant. | modern gel in a pump dispenser; transparent; sticky; not gynecologist recommended. | OK for lubricating; not formulated to moisturize. |
| Lubrin Suppositories, Upsher–Smith | Lubricant for vaginal dryness. | Waxy suppository; very slippery (no applicator); looks unappealing; cumbersome; not spontaneous. | Temporary moisturization adequate; not elegant. |
| Gynemoistrin, Schering–Plough | Medical Lubricant companion product to Gynelotromin yeast infection product. | Water based lubricant with applicator, similar to KY, in plastic tube and outer carton. | Good moisturization. |
| Very Private | Vaginal moisturizer for improved intimacy and general comfort. | Cosmetic; modern moisturizer and gel; transparent; good slip; safe; elegant; performs well; non-sticky; non greasy, no residue. | Moisturization excellent; better slip; smoother lubrication than competitors. Sexual enhancement. |

Report at 25.

Plaintiffs' chart is incomplete with respect to the characteristics of GYNE–

MOISTRIN® and TODAY®. In fact, GYNE–MOISTRIN® was labeled for either digital application or for use with an applicator. Prior to 1993, GYNE–MOISTRIN® was marketed as "specifically developed to soothe and relieve dryness by supplementing a woman's own moisture. [It] provides natural feeling vaginal moisture and lubrication. It is clear, colorless, odorless and proven to be non-irritating. [It] is water-based, greaseless and non-staining...." Deposition of Nancy Miller–Rich, Vice President of Business Development for Schering–Plough's Health Care Division, April 23, 1999 ("Rich Dep."), Defs.' 56.1, Ex. 45 at 20–24 & Exs. 46–48. In addition, GYNE–MOISTRIN®, like Very Private, was marketed as "long-lasting" and compatible with condoms. *See* Defs.' 56.1, Exs. 47–48. Likewise, TODAY®'s packaging prior to 1993 indicated that it "[s]upplements natural moisture when vaginal dryness, caused by normal changes in a woman's body, causes discomfort ... It is a natural feeling." Defs.' 56.1, Exs. 58 & 59. In addition, TODAY® is "[r]ecommended by doctors for use with condoms" and, like Very Private, is greaseless, non-staining and fragrance-free. *Id.*

In addition to the products acknowledged by plaintiffs to have been present in the market when Brandwynne disclosed her concept to Combe, defendants note at least three other such products.

### 1. ASTROGLIDE®

First developed in 1977, ASTROGLIDE® has been sold since at least 1982 by Biofilm, Inc. *See* Deposition of Daniel X. Wray, developer of ASTROGLIDE® and Founder of Biofilm, January 13, 1999 ("Wray Dep."), Defs.' 56.1, Ex. 33 at 8–9. ASTROGLIDE® was developed with a dual purpose. *See* Wray Dep. at 9 ("It was a vaginal moisturizer and a sexual lubricant"). ASTROGLIDE® is targeted to women experiencing vaginal dryness and to those who use condoms during sex, is sold nationwide in stores such as Safeway, WalGreen, Rite Aid, CVS, Wal–Mart,

Target and K Mart. *See id.* at 10–11. In 1993, ASTROGLIDE® changed its package design, moving away from a "sexual connotation" to a more "clinical look". *Id.* at 171–72. In about May of 1993, Biofilm designed new packaging for ASTROGLIDE® which was placed on the market in either September or October 1993. *Id.* at 57. The new outer-packaging included the following text:

> Second only to nature! Astroglide® is a water based gel that has been found to aid in relieving vaginal dryness and its complications. Its remarkable lubricating and moisturizing properties can enhance the pleasure of intimate activity. It can be used to lubricate condoms, tampons, rectal thermometers and enema and douche nozzles.

Defs.' 56.1, Ex. 39. The insert to the ASTROGLIDE® package features a description of the product's three general purposes:

> WHAT ARE THE USES FOR ASTROGLIDE®?
>
> VAGINAL MOISTURIZER
>
> It is a mistaken belief that vaginal dryness is an aging phenomenon. Actually, this condition can occur with women of all ages and from a variety of causes. Nursing mothers sometimes experience it. It sometimes occurs in women using oral contraceptives and has even been known to occur as a consequence of the extreme physical conditioning associated with competitive athletics. The common cause of vaginal dryness, however, is menopause, either natural or surgically induced. Many physicians prescribe Astroglide® to provide additional moisturizing and lubrication.
>
> PERSONAL LUBRICANT
>
> When used as a lubricant during intimate activity, Astroglide® enhances the body's own lubricating fluids. When applied to both surfaces of condoms, Astroglide® eliminates the unnatural feeling and more closely mimics the sensations

of natural sex. Astroglide® is compatible with all types of condoms and diaphragms.

### PATIENT LUBRICANT

Diagnostic instruments used by physicians and designed to be inserted into bodily orifices can be lubricated with Astroglide®. The product has high lubricity, is less messy than typical lubricating jellies and is easily removed with water. It can also be used to lubricate tampons, rectal thermometers as well as enema and douche nozzles.

Defs.' 56.1, Ex. 40. Together, the outer packaging and insert reveals that Astroglide® features some of the same characteristics as Very Private,[tm] including: clear liquid; applicator free; non-medicated; feels natural; "slip"; long-lasting; safe; physician tested; non-greasy; odorless; flavorless; stainless; leaves no residue; and compatible with condoms. *Compare* Defs.' 56.1, Exs. 39 & 40 *with* Report at 16, 25.

### 2. COMFORT®

Wet Formulas International has produced its COMFORT® personal lubricant since 1991. *See* Deposition of Michael Trygstad, President and CEO of Wet Formulas, January 14, 1999 ("Trygstad Dep."), Defs.' 56.1, Ex. 41 at 8. COMFORT® was developed to alleviate vaginal dryness and is distributed primarily through Rite–Aid and independent pharmacies. *See* Trygstad Dep. at 9–12. The packaging in which COMFORT® has been marketed since 1991 features several characteristics in common with Very Private; clear liquid; applicator free; non-medicated; feels natural; long-lasting; gynecologist approved; non-greasy; odorless; stainless; and condom compatible. *Compare* Defs.' 56.1, Exs. 42–44 *with* Report at 16, 25.

### 3. SUMMER'S EVE®

Prior to 1993, C.B. Fleet Co., Inc. marketed a line of feminine hygiene products under the trademark SUMMER'S EVE®. While these products were not vaginal moisturizers or lubricants, they feature the slogans "intimate cleanser", "intimate cleansing cloths", "intimate absorbent powder" and "intimate cleansing mist". Deposition of William Parsanko, Vice President of Marketing of C.B. Fleet, April 28, 1999 ("Parsanko Dep."), Defs.' 56.1 Ex. 60 at 22–30, 39–41, 62–71; Exs. 63–66. C.B. Fleet considers the term "intimate" to be synonymous with "vaginal" in the industry.[6] *See* Parsanko Dep. at 28. C.B. Fleet has not attempted to register these names as trademarks, nor does it claim any trademark rights in the names. *See id.* at 71–74.

### III. Legal Standard for Summary Judgment

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of a material factual dispute rests on the moving party. *See Nationwide Life Ins. Co. v. Bankers Leasing Assoc., Inc.*, 182 F.3d 157 (2d Cir.1999). Once that burden is met, the non-moving party must present significant probative supporting evidence that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. This evidence must be more than mere speculation and conjecture. *See*

---

6. Other feminine hygiene products using the word "intimate" to describe the vaginal area include BIDETTE® Intimate Feminine Deodorant Mist (©1969) (Defs.' 56.1, Ex. 71); FDS· Feminine Wash Intimate Cleanser (©1990) (Defs.' 56.1, Ex. 72); FDS Intimate Cleaning Foam (©1970) (Defs.' 56.1, Ex. 73); and Vespré Feminine Hygiene Deodorant Spray Mist (©1971) which was advertised as "the intimate odor preventative" (Defs.' 56.1, Ex. 73).

*Darnet Realty Assoc. v. 136 East 56th Street,* 153 F.3d 21, 23 (2d Cir.1998).

The Court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. *See Rodriguez v. City of New York,* 72 F.3d 1051, 1060 (2d Cir.1995). All ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). But, if the evidence presented by the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (quoting *Liberty Lobby,* 477 U.S. at 249–250, 106 S.Ct. 2505). The principles governing admissibility of evidence do not change on a motion for summary judgment. Rule 56(e) provides that affidavits in support of and against summary judgment "shall set forth such facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d. Cir.1997).

## IV. Discussion

Plaintiffs' twelve claims are divisible into three categories. First, claims one through seven and ten through twelve involve defendants' alleged fraud and misappropriation of plaintiffs' ideas and defendants' alleged breach of contract regarding those ideas. Defendants are entitled to judgment as a matter of law on these claims because Brandwynne cannot seek protection under any tort or contract theory for ideas which were neither novel nor original. Second, plaintiffs' ninth claim involves the wholly separate allegation that: (1) defendants have infringed plaintiffs' common law trademark rights by creating a likelihood of confusion between plaintiffs' and defendants' products; and (2) that defendants' product and packaging has infringed plaintiffs' protectable trade dress. However, plaintiffs cannot seek trademark protection for unprotectable marks or slogans. In addition, a side-by-side comparison of the products reveals that no reasonable jury could find a likelihood of confusion between plaintiffs' and defendants' trade dress. Finally, plaintiffs offer no evidentiary support for their eighth claim, alleging false advertising.

### A. Plaintiffs' Misappropriation, Breach of Contract and Fraud Claims

### 1. The Threshold Requirement of "Novelty"

■ A plaintiff asserting misappropriation of her idea must establish that her concept is sufficiently novel to be entitled to legal protection under New York law.[7] "New York law dictates that an idea, whether embodied in a product and called a trade secret or otherwise reduced to concrete form, must demonstrate novelty and originality to be protect[a]ble as a property right under '[any] cause of action for [its] unauthorized use.'" *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1178 (2d Cir.1993) (holding that New York law requires the same showing of "novelty" in trade secret claim as in "submission of ideas" claim and quoting *Murray v. Nat'l Broadcasting Co. Inc.,* 844 F.2d 988, 994 (2d Cir.1988)). Indeed, with-

---

**7.** New York law applies here because Combe Inc. and Combe Int'l are residents of New York and Brandwynne's disclosure and defendants' alleged misappropriation occurred in New York. *See Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.,* 118 F.3d 955, 967 (2d Cir.1997) (applying New York "interest analysis" choice of law in trade secret case). In addition, the Secrecy Agreement specifies that New York law governs any disputes arising from that agreement. *See* Defs.' 56.1, Ex. 30 ¶ 7.

out novelty, no cause of action exists pursuant to either tort or contract theory. *See, e.g., Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 299–300 (2d Cir.1986) (an action will not sound in tort for misappropriation of an idea unless idea was novel); *Downey v. General Foods Corp.,* 31 N.Y.2d 56, 61, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972) ("An idea may be a property right. But when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements.").

Because non-novel ideas are not "property", "they cannot be stolen". *Murray,* 844 F.2d at 993. Ideas which are not novel "are in the public domain and may freely be used by anyone with impunity." *Ed Graham Productions, Inc. v. Nat'l Broadcasting Co.,* 75 Misc.2d 334, 347 N.Y.S.2d 766, 769 (N.Y.Sup.1973). In fact, copying of ideas in the public domain is not only permitted, it is encouraged. *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* (4th ed.1999) (hereinafter *"McCarthy"*) § 1:28 (citing *American Safety Table Co. v. Schreiber,* 269 F.2d 255, 272 (2d Cir.1959) ("imitation is the life blood of competition. It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity.")).

■ "Whether an idea is novel is an issue of law which may properly be decided on a motion for summary judgment." *AEB & Assoc. Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 734 (S.D.N.Y. 1994). To establish novelty, an idea "need not reflect the 'flash of genius,' but it must show[ ] genuine novelty and invention, and

not a merely clever or useful adaptation of existing knowledge." *Educational Sales Programs, Inc. v. Dreyfus Corp.,* 65 Misc.2d 412, 317 N.Y.S.2d 840, 844 (N.Y.Sup.1970).

> An idea is impalpable, intangible, incorporeal, yet it may be a stolen gem of great value, or mere dross of no value at all, depending on its novelty and uniqueness. Its utility is not the test. An idea may be regarded as useful, and worth putting into execution, ·even though the imparting of it gives no claim for recovery to its originator.

*Id.* at 843.

### 2. Plaintiffs' Claims Arising From Misappropriation Theory

■ Count Four concerns defendants' alleged misappropriation of Brandwynne's trade secrets, namely, certain unpatented proprietary information, such as Brandwynne's unpatented chemical formulations,[8] related test results and data used in connection with the development and marketing of Very Private· Intimate Moisture. *See* Amended Compl. ¶¶ 67–71. It is beyond cavil that in order to state a claim for misappropriation of trade secrets, a plaintiff must show that she "possessed a trade secret". *Hudson Hotels,* 995 F.2d at 1176. Here, plaintiffs' purported "trade secrets" are defeated by their lack of novelty both at the time Brandwynne revealed them to defendants and certainly by the time plaintiffs began to market their product.

### a. Lack of "Novelty" Prior to Brandwynne's Disclosure to Defendants

Defendants have produced a mountain of evidence showing that vaginal moisturizers and lubricants similar to Very Private· had

---

**8.** None of the materials disclosed to Combe included a "secret recipe" or manufacturing process for Very Private.· In fact, the ingredients listed on the products indicate that VAGISIL® shares few ingredients with Very Private· (water, glycerin and propylene glycol).

Those three ingredients also appear in ASTROGLIDE®, and two of the three appear in COMFORT®. *See* Defs.' 56.1, Exs. 38, 39, 42. Therefore, it is unclear, and plaintiffs do not explain, how defendants have misappropriated their chemical formulation.

been produced and marketed prior to Brandwynne's negotiations with Combe. Like Very Private, several other brands were clear, non-medicated, liquid and applicator-free (ASTROGLIDE®, COMFORT®, TODAY®). At least four brands were promoted with similar slogans: "similar to the body's own lubricating fluids" (ASTROGLIDE®); "designed to supplement your natural moisture" (COMFORT®); "it supplements a woman's own internal moisture", "At last a woman has moisture that feels so much like her own", " … provides moisture that feels so much like your own", "It's a light, fresh gel that feels like your own natural moisture" (GYNE–MOISTRIN®); and "Supplements natural moisture … is natural feeling" (TODAY®). In addition, several brands: (1) provided "slip" for intimacy (ASTROGLIDE®, COMFORT®, GYNE–MOISTRIN®, TODAY®); (2) were safe and long-lasting (ASTROGLIDE®, COMFORT®, GYNE–MOISTRIN®); (3) were recommended by doctors (ASTRO-GLIDE®, TODAY®); (4) were non-sticky, non-greasy, odorless, tasteless and stainless (ASTROGLIDE®, COMFORT®, GYNE–MOISTRIN®); (5) left no residue (ASTROGLIDE®, COMFORT®); and (6) were compatible with condoms (ASTRO-GLIDE®, COMFORT®, GYNE–MOIST-RIN®, TODAY®).

Despite the fact that similar products were targeted to relieve the same problems as Very Private, featured the same elements and were distributed in the same channels of trade as proposed by Brandwynne, plaintiffs contend that Very Private's novelty exists not in each individual element of the product, but rather in the "entire product profile and positioning." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Mem."), 2. In short, plaintiffs allege that the combination of elements offered by Very Private was a "breakthrough" offering a "more cosmetic, appealing image" than other brands marketed in a racy or sexual manner. Affidavit of Joel Gilman, Brandwynne advertis-ing consultant, July 20, 1999 ("Gilman Aff."), Pls.' 56.1, Ex. 3, ¶ 9.

Plaintiffs liken the information Brandwynne provided to Combe to "a compilation of information used in one's business which confers a competitive advantage over those in a similar businesses who do not know it or use it." *Lynch, Jones & Ryan, Inc. v. Standard & Poor's*, slip op. 117064/97, 1998 N.Y. Misc. LEXIS 334, *7, 1998 WL 574166, *—— (Sup.Ct. N.Y. Co. June 15, 1998) (denying motion to dismiss misappropriation of trade secret claim for data compiled in weekly publication). The Restatement of Torts lists several factors to be considered in evaluating Brandwynne's claim of trade secrecy:

(1) the extent to which the information is known outside of [her] business; (2) the extent to which it is known by employees and others involved in [her] business; (3) the extent of measures taken by [Brandwynne] to guard the secrecy of the information; (4) the value of the information to [Brandwynne] and [her] competitors; (5) the amount of effort or money expended by [Brandwynne] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

American Law Institute, Restatement of the Law of Torts (1st ed.1939) § 757, cmt b at 6. As discussed more fully below, consideration of the above factors, particularly numbers one and six, results in the inescapable conclusion that plaintiffs' concept is not entitled to trade secret protection under New York law.

Even assuming, arguendo, that plaintiffs provided a compilation of elements never before offered to the public, plaintiffs' idea nevertheless lacks novelty because a combination of pre-existing elements is not considered "novel". For example, in *Murray v. Nat'l Broadcasting Co., supra*, plaintiff sued a television network for, *inter alia*, misappropriation, breach of an implied contract and unjust enrichment,

for allegedly "stealing" his idea for a television sit-com involving an African–American middle-class family which plaintiff had pitched to the network four years before "The Cosby Show" aired. *Murray,* 844 F.2d at 989. Plaintiff argued that the novelty of his idea was confirmed by the media and the viewing public's recognition of the "unique" and "revolutionary" portrayal of an African–American family on "The Cosby Show." *Id.* at 992–93. While the Second Circuit agreed that "The Cosby Show" constituted a "breakthrough" for the television industry, it nevertheless concluded that the idea for the show was not "novel" as its essence was "nothing more than a variation on a basic theme". *Id.* at 993. Plaintiff's proposal for the sit-com "merely combined two ideas which had been circulating in the industry for a number of years—namely, the family situation comedy, which was a standard formula, and the casting of black · actors in non-stereotypical roles." *Id.* at 991 (quoting district court opinion at 671 F.Supp. 236, 241 (S.D.N.Y.1987)). The fact that such a scenario had never before been televised does not necessarily mean that the idea for the program was novel. *Id.* at 992. Likewise, Brandwynne's combination does not constitute a "novel idea" meriting protection under New York law.

Plaintiffs contend that defendants' advertising for VAGISIL® concedes that the product concept is indeed novel. Press releases announcing Combe's new product advertised: "A unique moisturizer that relives vaginal dryness" (VAGISIL® Fact Sheet, June 1996); "[Women] report that they are frustrated and dissatisfied with many of the products currently available. This new product addresses their needs.... This is not at all like existing products, such as gels, creams or lubricants used for dryness," (VAGISIL® Press Release, April 28, 1996). Pls.' 56.1, Ex. 17. Notwithstanding these self-serving statements regarding the "uniqueness" of Combe's product, the concept was not "novel" under New York law.

*Educational Sales Programs, Inc. v. Dreyfus Corp., supra,* is directly on point. There, an organization engaged in sales training revealed in confidence to defendant, one of the largest mutual funds in the world, its idea to send cassette tapes containing educational and promotional material to independent mutual fund salesmen. The parties failed to negotiate a joint venture. Nevertheless, defendant immediately proceeded with a tape cassette program of its own. Plaintiff brought suit for breach of confidentiality, unjust enrichment and misappropriation. Finding plaintiff's idea lacking in novelty, the court quickly dispelled any perceived inconsistency created by defendant's advertising of its product as "new" and "unique".

> Plaintiff makes much of defendant's own words describing its program. Defendant advertised it to the trade as 'an exciting new development', and told the subscribers they were participating in a 'unique program'. This is the traditional puffery of advertising jargon. Just as the language of the sailor is punctuated by pithy expletives, so the language of the salesman is studded with superlatives and hyperbole. But what is 'unique' in advertising need not be regarded as such in the law.

*Educational Sales,* 317 N.Y.S.2d at 845.

**b. Defendants' Own Research and Development**

Ironically, plaintiffs' submissions regarding Combe's product development demonstrate further that Brandwynne's concept lacked novelty. At least five months prior to Brandwynne's disclosure, Combe's feminine hygiene product expert had already begun research and development of a feminine moisturizer, much like Very Private, to compete with Warner–Lambert's RE-PLENS® and Schering–Plough's GYNE-MOISTRIN®. Thus, Brandwynne's concept was neither novel to the industry in general, nor to Combe in particular.

#### c. Marketing of Very Private- Defeats "Novelty"

■ Assuming, arguendo, that Brandwynne's marketing concept and product were novel, original and confidential at the time she conceived them and disclosed them to Combe, they would have certainly entered the public domain when the product was placed on sale and disclosed to the public in a marketing campaign. Once a trade secret is marketed and readily visible and ascertainable upon inspection in the open market, it is no longer protected. *See Hudson*, 995 F.2d at 1177 (collecting cases). Plaintiffs admit that the Very Private- package reflected the purported trade secrets provided to Combe. *See* Pls.' Mem. at 20. The packaging reflects Brandwynne's alleged proprietary ideas, including the product's ingredients and the descriptive text used to market the product. Thus, at the very latest, plaintiffs' idea entered the public domain in April 1994 when Brandwynne began marketing and selling Very Private- Intimate Moisture. Because defendants did not test market and sell their competing product until July 1995, one year and two months after Brandwynne placed her product on the market, defendants could not have misappropriated any protected idea.

#### d. Conclusion Regarding Plaintiffs' Misappropriation Claims

In response to the overwhelming evidence submitted by defendants on the question of novelty, plaintiffs merely raise the allegations and denials in their pleadings that the combination of elements comprising Brandwynne's concept was "new" and "unique" to the industry. These conclusory statements do not create a dispute about a material fact. Given the one-sidedness of the evidence, no reasonable trier of fact could find other than for the defendants regarding the protectability of plaintiffs' concept. Failure to meet this threshold test of novelty defeats plaintiffs' fourth claim for misappropriation of trade secrets.

### 3. Plaintiffs' Claims Arising From Various Contract Theories

#### a. Lack of Property Rights Defeats Plaintiffs' Contract Claims

■ Because Brandwynne's ideas were neither novel nor original, they have no value as property. "Nothing is bestowed if the facts of a 'secret' imparted in confidence are already the subject of general knowledge.... Under those circumstances the promise of compensation or confidentiality, even though undoubtedly made, is without consideration." *Educational Sales*, 317 N.Y.S.2d at 843. Therefore, no consideration was given for Combe's promise to keep Brandwynne's ideas in confidence.

#### b. Claims Arising Under the Secrecy Agreement

Count Three alleges that Combe Int'l misappropriated ideas under various breach of contract theories. In Count Twelve, plaintiffs allege that defendants have been unjustly enriched because Combe has reaped a financial benefit from plaintiffs' provision of materials and services. *See* Amended Compl. ¶¶ 106–109. Because no property rights were imparted pursuant to the Secrecy Agreement, there has not been, nor could there have been, a breach of the Secrecy Agreement.[9] Nor could defendants have breached their fiduciary obligations and duty of loyalty pursuant to the Secrecy Agreement (Count Seven). *See* Amended Compl. ¶¶ 82–85. The Secrecy Agreement expressly excluded from its obligation of confidentiality any information which "at the time of disclosure is in the public domain" or disclosed

---

9. For this reason, Count Two also fails. There, plaintiffs allege, as an alternative to Count One, that Brandwynne, as the whole owner of Bran.Corp. is entitled to seek relief for damages as a third-party beneficiary of the Secrecy Agreement from Combe Inc. *See* Amended Compl. ¶¶ 53–62.

to third parties through no fault of Combe. Defs.' 56.1, Ex. 31.

Even assuming, arguendo, that plaintiffs possessed a property right in the ideas disclosed to Combe, plaintiffs' rights regarding those ideas would be governed exclusively by the Secrecy Agreement. Although Combe Int'l did not accept the terms of the Confidentiality Agreement proposed by Brandwynne, plaintiffs nevertheless allege that defendants accepted Brandwynne's Report and materials subject to the terms contained in the Report and then breached those terms. *See* Amended Compl. ¶¶ 63–66. However, the Secrecy Agreement explicitly merged and superceded any and all prior agreements relating to any contemplated transaction regarding Brandwynne's proposed product. *See* Defs.' 56.1 Ex. 31 ¶ 8.

■ Plaintiffs allege in Count Five that defendants have engaged in unfair competition by marketing and selling, for defendants' own benefit and consequently at plaintiffs' expense, products that were derived from plaintiff's expenditure of labor, skill and money. *See* Amended Compl. ¶¶ 72–74. Brandwynne alleges that defendants diverted the profits and goodwill that otherwise would have accrued to Brandwynne, thereby affecting Brandwynne's strength in the industry. Plaintiffs have offered no evidence that defendants derived their product concept from Brandwynne. Not only was the concept already in the public domain, but Combe was well on its way to developing its own concept for VAGISIL® five months prior to Brandwynne's disclosure. Because the concept was in the public domain, anyone, including defendants, was free to develop and market the product. In addition, there is no evidence that plaintiffs were deprived of the opportunity of promoting the idea with another company.

#### c. Claims Asserting Breach of Implied Contracts

■ In Count One, Brandwynne alleges that Combe Int'l breached an "im-plied-in-fact" contract between the parties by furnishing Combe Inc. with Brandwynne's Report and materials for the purpose of misappropriating her concept for the benefit of Combe Inc. and Combe Int'l. *See* Amended Compl. ¶¶ 46–52. An implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract. *See, e.g., AEB & Assoc.,* 853 F.Supp. at 731. "[T]he prerequisite for such a contract is that there be no express agreement dealing with the same subject matter." *Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68, 71 (S.D.N.Y.1988); *see also Julien J. Studley, Inc. v.. New York News, Inc.,* 70 N.Y.2d 628, 629–30, 518 N.Y.S.2d 779, 512 N.E.2d 300 (1987). Because the Secrecy Agreement exclusively governs the rights and obligations of the parties with respect to Combe's use of Brandwynne's ideas, no contract regarding the subject matter covered by the Secrecy Agreement may be implied-in-fact.

#### 4. Plaintiffs' Claims Arising From Defendants' Alleged Fraud

■ Brandwynne's sixth claim alleges that between September 1993 and the summer of 1994, defendants failed to disclose that Combe Int'l and Combe Inc. were in the process of creating a vaginal moisturizing product. Rather, defendants made certain misrepresentations which caused plaintiffs to presume that defendants were not independently pursuing such a product. *See* Amended Compl. ¶¶ 75–81. Had Brandwynne known of defendants' plans, she asserts she never would have shared her information with them. Brandwynne's tenth claim alleges that defendants fraudulently represented that they would be interested in pursuing a joint venture, when they never intended to enter into such an arrangement, but only sought to induce Brandwynne to share her research and development. *See* Amended Compl. ¶¶ 96–102. In further-

ance of this scheme, defendants allegedly substituted their Secrecy Agreement for plaintiffs' Confidentiality Agreement intending the Secrecy Agreement to permit their use of plaintiffs' materials "obligation-free".[10]

For the reasons explained above, plaintiffs' fraud claim also fails because a plaintiff "cannot be defrauded of property that [s]he does not own." *Murray,* 844 F.2d at 994. A fraud claim requires a showing of injury as the proximate result of the alleged fraudulent conduct. *See id.* Because plaintiffs' idea was in the public domain when defendants allegedly used it, plaintiffs suffered no injury and the fraud claim must be dismissed.

**B. Plaintiffs' Claims for Common Law Trademark and Trade Dress Infringement**

Brandwynne asserts two common law trademark claims. First, she alleges that defendants' use of particular slogans in association with its product is likely to cause consumer confusion with the line of products manufactured by plaintiffs. *See* Amended Compl. ¶¶ 91–95. Second, plaintiffs contend that their product packaging constitutes legally protectable trade dress which defendants have infringed.

**1. Common Law Trademark Infringement**

**a. Is Plaintiffs' Mark Entitled to Protection?**

██ Because Brandwynne asserts only common law trademark rights, she bears the burden of establishing valid trademark status. *See Reese Pub. Co., Inc. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980). The term "trademark" includes "any word, name, symbol, or de-

vice, or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Marks are often classified in categories of generally increasing distinctiveness: generic, descriptive, suggestive, arbitrary, or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). The latter three categories of marks are deemed "inherently distinctive" and are entitled to protection. In contrast, generic marks—those that "refer[ ] to the genus of which the particular product is a species," *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), are ineligible for trademark protection.

██ A term that literally describes a product or a term that describes a product's qualities, characteristics, purpose or utility is "descriptive". *See, e.g., Gruner+Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1076 (2d Cir.1993); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1040 (2d Cir. 1992). Marks which are merely descriptive of a product are not inherently distinctive and hence cannot be protected. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). However, descriptive marks may acquire distinctiveness allowing them to be protected. This acquired distinctiveness is generally called "secondary meaning." *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. A term has secondary meaning when, through its owner's use, it "has become distinctive of the applicant's goods in commerce." *Id.* (quoting 15 U.S.C. §§ 1052(e) & (f)).

10. It bears noting that Brandwynne's proposed Confidentiality Agreement has many of the same terms that are found in the executed Secrecy Agreement, including the absence of any obligation to enter further remunerative agreements, the merger of all prior agreements, and an exception to the confidentiality obligation for all information which is "publicly available." *Compare* Defs.' 56.1, Ex. 29 *with* Ex. 31. The disposition of this case would be the same regardless of whether the parties executed the Secrecy Agreement or the Confidentiality Agreement.

### i. The Term "Intimate" Is Generic and Not Entitled to Protection

■ Plaintiffs allege that defendants' use of particular slogans is likely to cause consumer confusion. Specifically, these slogans are: "Intimate Moisture"; "duplicates a woman's own moisture"; "feels as natural as a woman's own moisture"; "so natural its like a woman's own moisture"; "the closest thing to your own natural moisture".[11] As Brandwynne has already disclaimed any trademark rights in the word "moisture", the Court must focus on the protectability of the terms "intimate" and "intimate moisture". Types of evidence to consider in determining genericness include: (1) generic use of the term by competitors which plaintiff has not challenged; (2) plaintiff's own generic use which may have an estoppel effect; (3) dictionary definitions which, while not determinative, may be relevant if not persuasive; (4) generic usage in trade journals or newspapers; (5) testimony of persons in the trade; and (6) consumer surveys. *See* 2 *McCarthy* § 12:13.

■ To date, plaintiffs have not challenged any third-party usage of the term "intimate" as applied to products involving the vaginal area. Yet, the feminine hygiene industry is replete with uses of the word "intimate" on products such as SUMMER'S EVE®, BIDETTE®, FDS®, and Vespré. *See* Defs.' 56.1, Exs. 63–73. Moreover, there is significant third party use of similar slogans: "similar to that of the body's own lubricating fluids.... Second only to nature" (ASTROGLIDE®); "designed to supplement your natural moisture" (COMFORT®); "supplementing a woman's own moisture ... provides nat-

ural feeling vaginal moisture ... supplements a woman's own internal moisture" (GYNE–MOISTRIN®); "supplements natural moisture ... natural feeling" (TODAY®). Defs.' 56.1, Exs. 38–40, 42–44, 46–59. Plaintiffs themselves use the words "intimate", "intimate moisture" and "intimate moisturizer" interchangeably in their Amended Complaint and advertising to refer to the vaginal area and vaginal moisturizer. *See* Amended Complaint ¶¶ 12, 14, 15, 16, 19, 20, 23, 43; Defs.' Exs. 77 & 78. This demonstrates plaintiffs' own opinion that the terms are appropriate common names for the product. *See, e.g., In re Bausch & Lomb, Inc.,* 206 U.S.P.Q. 534, 538, 1979 WL 24802 (T.T.A.B. 1979)(where trademark applicant used term in own literature as common noun for goods, "no amount of evidence could result in recognizable trademark rights"). Furthermore, Webster's Dictionary offers several alternative definitions of intimate, including, "of a very personal or private nature" (Webster's Dictionary 634 (9th ed.1985)) and "befitting deeply personal (as ... sexual) matters ... usu[ally] kept private or discreet ... marked by sexual relations" (Webster's Dictionary 1184 (3d ed.1963)).

In addition, persons in the trade have indicated that they associate the word "intimate" with "vaginal" and the vaginal area. *See* Rich Dep. at 50 (word "intimate" in context of feminine hygiene products relates to a woman's vagina); Parsanko Dep. at 28, 38, 40–41 ("intimate" in this context means "vaginal area"). Moreover, when combined with "moisture" or "moisturizer", the term "intimate" indicates a category of products.[12] Such terms have

---

**11.** In a proceeding before the Trademark Trial and Appeal Board that has been stayed pending the outcome of this litigation, defendants maintain that the phrase "intimate moisture" cannot be trademarked due to its generic nature.

**12.** Plaintiffs erroneously assert that defendants are estopped from arguing that the term "intimate moisturizer" cannot be a valid trademark because defendants at one time

placed a "TM" symbol on their commercial packaging next to those words. In fact, defendants discontinued that practice long ago and plaintiffs can cite to only one aberrant subsequent use of the "TM" symbol by defendants. Regardless, defendants' mere use of the "TM" symbol would not bestow a generic term with valid trademark status. *See, e.g., In re Sports Tigers,* 213 U.S.P.Q. 670, 671, 1982 WL 52014 (T.T.A.B.1982).

generally been held to be generic. *See, e.g., Johnson & Johnson v. Carter–Wallace, Inc.,* 487 F.Supp. 740, 744 (S.D.N.Y. 1979)("Baby Oil" generic term for mineral oil); *rev'd on other grounds,* 631 F.2d 186 (2d Cir.1980); *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.,* 561 F.2d 75, 80 (7th Cir.1977)("Light Beer" or "Lite Beer" generic names for type of beer light in body or taste). Finally, the combination of two generic terms, such as "intimate" and "moisture" or "moisturizer", into one term does not alter its generic character. *See, e.g., Turtle Wax Inc. v. Blue Coral Inc.,* 2 U.S.P.Q.2d 1534, 1536, 1987 WL 123820 (T.T.A.B.1987)(combination of generic terms "wash" and "wax" in "WASH-WAX" does not alter character of individual components or commercial impression engendered by mark).

The evidence on this issue compels the conclusion that the terms "intimate" and "intimate moisture" would not be understood by potential customers as words indicating source or origin. Rather, the words are either understood as the generic name for a category of products or, they are understood as words describing the character of the products. Because the line between descriptive terms and generic names is often "fuzzy", 2 *McCarthy* § 12:20 at 12–50.1, I will also address the question of whether the terms are entitled to protection as descriptive marks.

### ii. Plaintiffs Cannot Establish Secondary Meaning

█ If the term "intimate moisture" is descriptive rather than generic, plaintiffs must prove secondary meaning in order to establish protectable trademark rights.

Secondary meaning is an issue of fact. If plaintiff has the burden of proving secondary meaning in a mark, and defendant moves for summary judgment

pointing to evidence that tends to show the lack of secondary meaning, summary judgment will be granted unless plaintiff comes forward to show an issue of fact on secondary meaning.

5 *McCarthy* § 32:119 at 32–175; *see also Bernard v. Commerce Drug Co.,* 964 F.2d 1338 (2d Cir.1992)(summary judgment appropriate where plaintiff produced no evidence that a descriptive word has achieved a secondary meaning). Our Court of Appeals considers several factors in determining secondary meaning, including: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use. *See Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 143 n. 4 (2d Cir.1997).

█ Here, Brandwynne has used the term "intimate moisture" for only five years and her use has not been exclusive. Total advertising expenses for the past three years are $120,000. Plaintiffs sell in only three states, achieving a total of $100,000 in sales in 1998. There is no evidence that Very Private- has come to the attention of the press or public other than by its own efforts. As a result, it is extremely unlikely that a reasonable jury would find that Brandwynne has established "secondary meaning" in the term "intimate moisture".[13] Even if plaintiffs could establish secondary meaning, summary judgment on plaintiffs' trademark infringement claim is warranted because plaintiffs have failed to offer, as they must, any evidence whatsoever that defendants' use of the term is likely to confuse "an appreciable number of ordinarily prudent purchasers." *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 578–80 (2d Cir.1991) ("[w]hether a trademark owner

---

**13.** Even if plaintiffs could establish secondary meaning in the composite mark "intimate moisture", they may not rely upon that secondary meaning to establish secondary meaning in "intimate" which is only one component of that mark. *See Self–Realiza-* tion *Fellowship Church v. Ananda Church of Self–Realization,* 59 F.3d 902, 912 (9th Cir. 1995) ("A court may not review the validity of a composite-term trademark by 'dissecting' the term and reviewing the validity of its component parts individually").

receives judicial protection depends on whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.").[14]

The Second Circuit has expressly stated that summary judgment is appropriate in trademark actions where plaintiffs have failed to elicit evidence to support their claims. *See, e.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 (2d Cir.1986) (application of undisputed facts to issue of likelihood of confusion is legal issue appropriately decided on motion for summary judgment); *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 115 (2d Cir.1984) (affirming district court's grant of summary judgment against plaintiff with respect to trademark infringement claim, explaining that plaintiff "failed to raise a question of fact on the issue of the likelihood of ˙consumer confusion"). On the record before me, and drawing all reasonable inferences against the moving party, I conclude that no reasonable jury could return a verdict for plaintiffs on their common law trademark infringement claim.

## 2. Trade Dress Infringement

■ The trade dress of a product "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics." *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985) (citations omitted). In examining trade dress, "the focus is on the entire look of the product or packaging." *Bristol–Myers Squibb Co.,* 973 F.2d at 1042. A side-by-side comparison of plaintiffs' and defendants' product and packaging reveals virtually no similarities. Very Private˙ Intimate Moisture is sold in a white bottle and box with a beige and white label and green lettering. VAGISIL® is sold in a pearl-

colored bottle and a white and light blue box containing blue and purple lettering. The VAGISIL® box is twice as wide as the Very Private˙ box. The VAGISIL® dispenser appears at the top of the bottle while the Very Private˙ dispenser is at the bottom. The salient feature of each product is its highly distinguishable brand name: "Very Private"˙ appears in enlarged white capital letters within a dark green rectangle; VAGISIL® appears in large purple lower case letters with a large stylized purple and blue "V" in a blue box. *Compare* Defs.' 56.1, Exs. 74, 75 *with* Ex. 87. When a defendant prominently displays its own brand name in conjunction with a similar mark, the likelihood of confusion is reduced. *See W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993). The record of this case establishes, as a matter of law, that Combe's product and packaging could not cause either actual confusion or the likelihood of confusion in the mind of the consumer. Therefore, summary judgment is granted on plaintiffs' trade dress infringement claim.

## C. Plaintiffs' Claims for False Advertising Under the Lanham Act and New York General Business Law

■ Brandwynne asserts that Combe Inc. misleads customers and causes consumer confusion by falsely describing its product and by misrepresenting the origin of its product. *See* Amended Compl. ¶¶ 86–90. Specifically, plaintiffs claim that the following assertions made by defendants in their advertising and product labeling are false:

o that the product was "developed with women gynecologists";

o that Combe Inc. owns the trademark "intimate moisturizer";

o that the product formula is "unique";

---

**14.** While plaintiffs are proposing to offer consumer confusion surveys at trial, they are obliged to proffer such evidence now. Plain-

tiffs' failure to do so leaves the record barren of any evidence of confusion.

o that it created the concept of non-greasy and natural vaginal moisturizer; and

o that the product is "not like ordinary jelly, gels, and lubricants".

*Id.* at ¶ 89. These allegations also provide the basis for Count Eleven—that defendants' false advertising violates New York General Business Law (the "G.B.L.") § 349(a). *See* Amended Compl. ¶¶ 103–105.

The heart of plaintiffs' proof that defendants have misrepresented that their product was "developed with women gynecologists" is a letter from Cynthia D'Andrea–Herns to Dr. Elizabeth Connell, Combe's "on-call" gynecologist, requesting her opinion of the products under development. *See* Letter from D'Andrea–Herns to Dr. Connell, March 28, 1995, Pls.' 56.1, Ex. 32. In the letter, D'Andrea–Herns explains that the enclosed "Vagisil moisturizer prototype formula" was tested among over 900 women. Plaintiffs suggest that this letter shows that defendants did not submit their product to women gynecologists until after the product had already been developed. Plaintiffs' interpretation of this letter is erroneous on its face. The letter, in fact, shows that Combe enlisted the assistance of Dr. Connell in developing its "prototype".

In addition, plaintiffs allege that contrary to the assertion on the VAGISIL® package, the product is not "safe" or non-irritating because Combe used an untested polymer that had previously been used in shampoos and had never been used internally.[15] Plaintiffs' "evidence" is really just a series of unconfirmed assumptions which are rebutted by defendants' submissions. For example, defendants' toxicological in vitro tests and clinical studies conducted under the supervision of a board certified gynecologist before the product was test marketed revealed that the product was safe. *See* Vagisil Moisturizer RD 2503

Safety Testing, August 24, 1995, Defs.' 56.1, Ex. 99. In addition, between July 1995 and March 1999, Combe received only 34 "Irritation Reports" from total sales of well over 3 million units of its product (an irritation incidence of only 0.001%). *See* Affidavit of Carrie J. Barsuhn, Combe Int'l Director of Consumer Affairs, July 30, 1999, Defs.' 56.1, Ex. 101 at ¶ 2. Plaintiffs' allegations of false advertising are simply not supported by any evidence. Therefore, defendants' motion for summary judgment on claims eight and eleven is granted.

## V. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this case.

---

**15.** This allegation was not raised in plaintiffs' Amended Complaint, and plaintiffs have not moved to further amend. Nevertheless, be-

cause plaintiffs' allegations regarding the safety of VAGISIL® appear unfounded, they are easily addressed and dismissed.